# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

BENJAMIN SAMUEL RICH fka SAMUEL GUILLAUME

21 Civ. 3835 (AT) (DCF)

Plaintiff,

V

**FIRST AMENDED COMPLAINT**

NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE;
SHIPLA KALRA,
DAVID NASAR,
DETECTIVE MICHAEL MILLER,
DETECTIVE VINCENT CORRANDO,

Defendants

Plaintiff in Pro Per, BENJAMIN SAMUEL RICH formerly known as SAMUEL GUILLAUME brings this action against the above Defendant, Plaintiff alleges the following based upon information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to themselves.

## <u>INTRODUCTION</u>

1.     This case is about human dignity and how we treat the most vulnerable among us. Having nowhere else to turn, Plaintiff brings this action to address the numerous Deceits, unlawful detention, malicious prosecution and violation of due process law by the Defendants against the Plaintiff. Knowing fully well that Plaintiff has limited resources and income, Defendants exploited Plaintiff by subjecting him to mistreatment that are nothing short of vile. This action seeks to end the illicit conducts of the Defendants against the Plaintiff. By the complaint in this case, plaintiff seeks judicial redress for violations of his constitutional and civil rights.

2.     Defendants' acts and practices, as described herein, constitute unlawful, fraudulent, or unfair practices, in that (1) Defendants' actions violate numerous statutes as described in this Complaint; (2) the justification for Defendants' conducts are outweighed by the gravity of the consequences to Plaintiff; (3) Defendants' conducts are immoral , unethical,

oppressive, unconscionable, or substantially injurious to Plaintiff, and/or; (4) the uniform conduct of Defendants has a tendency defraud and cause financial loss to Plaintiff.

3.      Plaintiff's claims are brought pursuant to the Fourth, Fifth and Fourteenth amendments of the United States Constitution; Title VI of the Civil Rights Act of 1964 and its implementing regulations, 42 U.S.C. § § 1982, 1983,1985 and 1986;

## JURISDICTION

4.      This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 2201. Declaratory relief is authorized under 28 U.S.C. §§2201 and 2202.

5.      A substantial part of the events giving rise to the claims alleged in this Complaint arose in this County. Venue therefore lies in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C.§84(a), and 28 U.S.C. § 1391(b)(2).

## PARTIES

6.      Plaintiff Benjamin Samuel Rich, fka, Samuel Guillaume is, and at all relevant times herein mentioned is Plaintiff resides in Kings County in the State of New York. Plaintiff's color and physical appearance is similar to that commonly associated with individuals of African, Black-American, or African-American descent.

7.      Upon information and belief, Defendant SHIPLA KALRA, (hereafter "KALRA"), is and was at all times herein mentioned is an employee of the New York County District Attorney's Office.

8.      Upon information and belief, Defendant DAVID NASAR, (hereafter "NASAR"), is and was at all times herein mentioned is an employee of the New York County District Attorney's Office.

9.      Upon information and belief, Defendant MICHAEL MILLER, (hereafter "MILLER"), is and was at all times herein mentioned is an employee of the New York City Police Department. And Det. Miller's supervisor, who approved all reports written in the criminal case related to this instant action.

10.     Upon information and belief, Defendant VINCENT CORRANDO, (hereafter " CORRANDO"), is and was at all times herein mentioned is an employee of the New York City Police Department.

11.     Upon information and belief, at all relevant times each defendant was the agent and/or employee of each of the remaining defendant, and in doing the things herein alleged was acting within the course and scope of his employment and under color of law. Each of the defendant caused, and is responsible for, the unlawful conduct described herein. Each defendant is responsible for plaintiff's injuries by personally participating in the unlawful conduct; acting jointly and in concert with others who did so; authorizing, acquiescing or failing to take action to prevent the unlawful conduct; promulgating policies and procedures pursuant to which the unlawful conduct occurred; failing and refusing, with deliberate indifference, to implement and maintain adequate training and supervision; and/or by ratifying the unlawful conduct.

12.     All of the defendants, and each of them, are sued both in their individual and official capacities.

## FACTUAL ALLEGATIONS

13.     On January 6, 2016, Plaintiff Mr. Rich was present at the Highline Ballroom as an invited guest of Ballroom Employee Wasief Quahtan at the venue's employee holiday party.

14.     In the early morning hours of January 6,2016, Plaintiff was asked to leave the Ballroom after Ms. Quahtan and the Ballroom owner engaged in an argument over Quahtan bringing Plaintiff to the party.

15.     Plaintiff was in the restroom at the time of the argument, and when he returned, he was dumbfounded as to why he was being asked to leave the club by Security and Victim Avery Jackson.

16.     As Plaintiff is being forcibly escorted from the club. Victim Jackson is being belligerent and aggressive toward Plaintiff. Shortly after Plaintiff is escorted from the club a shooting occurs outside the venue in which shots were allegedly fired toward Victim Avery Jackson.

17.   The shooting was investigated by New York City Police Detective Michael Miller. Det. Miller interview witness/victim Avery Jackson. Victim Jackson initial told Det. Miller that he saw Plaintiff outside the club, open the trunk of the Rolls Royce, pull out a gun, and shoot in the direction of the Highline Ballroom.

18.   Victim Jackson never attempted to call 911 through out the incidents and Det. Miller never asked why.  Rather victim Jackson told the first responding police officers. Officers Giacon, Bongvort, and Antonio Guzman, that Plaintiff was escorted from the club because he was intoxicated and that Plaintiff "went to his car, removed a firearm from the vehicle trunk and fired several shots." There is no mention that the gunshots were fired at the club or Victim Jackson. The first responding officer report seeing "multiple shell casing on the street" but not where on the street in relation to the club the casings were seen.

19.    Victim Jackson falsely tells Det. Miller that prior to the shooting. Plaintiff had to be forcibly ejected from the club after being involved in an altercation with the club manager, that Plaintiff was belligerent with him, and that Plaintiff threatened that he had a gun. Surveillance video obtained during the trial, withheld by Defendants, the Prosecuting Attorneys for more than eighteen (18) months, shows that Victim Avery was the aggressor toward Plaintiff as he was escorted from the club. Video shows Plaintiff calm, peaceful, and cooperative.

20.   Victim Jackson initially reports to Det. Miller that Plaintiff was being forcibly ejected from the club near the stairwell that led to the back exit, and it is at that time Plaintiff allegedly threatened Victim Jackson that he had a gun and that shots could be thrown Victim Jackson's way.

21.    Det. Miller writes in a subsequent DD-5 report at 11:20 a.m. the day of the shooting that Plaintiff was escorted from the club at the front of the building.

22.    Det. Miller writes in an early report that NYPD personnel canvassed the area for witnesses, and none could be found.

4

23.     However, there were numerous witnesses, which during his investigation Det. Miller failed to interview and/or disregarded information witnesses provided that contradicted Victim Jackson's account of events. One such witness was the female 911 caller, who lived in an apartment next door to the club, who stated in her call that after she heard shots fired, she witnessed a man jump into a black sedan speeding down the street.

24.     The 911 callers statement completely contradicts Victim Jackson's statement to Det. Miller that when shots were fired Victim Jackson ran back into the club. In fact. Victim Jackson ran down the street and jumped into a black sedan (in the area where the shell casings were found) at the time the shots were fired. Det. Miller failed to investigate and/or follow up with the 911 caller statement, that made it more likely that it was Victim Jackson who fired the shots before jumping into the black sedan to chase Plaintiff down in the white Rolls Royce.

25.     Victim Jackson never told Det. Miller that he ran down the street and jumped in a black sedan and chased after Plaintiff in the Roll Royce.

26.     Det. Miller, despite being aware of the discrepancies between Victim Jackson's contradictory accounts of what happened inside the club, and what the 911 caller observed, Det. Miller pursued Plaintiff as the only suspect in the shooting rather than a witness or just a person of interest.

27.     During the shooting investigation, Det. Miller obtained Drop-cam interior video footage of the club, which completely contradicts Victim Jackson's statement that Plaintiff was involved in a verbal altercation with the manager which led Plaintiff to be forcibly removed from the club.

28.     The interior Drop-cam footage shows Victim Jackson being the aggressor, and Plaintiff leaving the club peacefully and the only person being belligerent is Victim Jackson.

29.     During his investigation, Det. Miller also comes into possession of exterior surveillance video outside the club, which further contradicts many of Victim Jackson's statements. Reports by Det. Miller give varying accounts of what Victim Jackson told Det.

Miller. In one report, Det. Miller writes that Victim Jackson stated that Plaintiff was parked outside the club, gets out of the car, goes to the trunk, pulls a weapon and fires. Then Det. Miller writes that Victim Jackson says Plaintiff was parked down the street, drives about 40 yards, and stops double parked across from the club, gets out of the car, goes to the truck and pulls a firearm and shoots. In all the varying accounts, Det. Miller embellishes Victim Jackson statement from first Just "fires shots," then "fires shots toward" the club, then "fires shots at" Victim Jackson.

30. The exterior video obtained by Det. Miller actually shows Plaintiff driving away in his white Rolls Royce, and a man jumping into a black sedan, which was parked outside the club, chasing Plaintiff—corroborating the 911 callers detail of events surround the shooting.

31. Det. Miller used his own added facts and embellished statements on subsequent DD-5s (follow up reports called Unusual Occurrence Reports), on sworn search warrant affidavits to obtain a felony arrest warrant for Plaintiff.

32. Based solely on Victim Jackson's contradictory statements of events surrounding the shooting, and Det. Miller's embellishment facts, Det. Miller obtained a felony warrant for Plaintiff s arrest on January 10, 2016 for Attempted Murder in the Second Degree (Penal Law §§ 110, 125.25(1), Assault in the First Degree (Penal Law §§ 110, 120.10), and two counts of Criminal Possession of a Weapon (Penal Law §265.03(3), 265.03(1 )(b)) based on false, misleading, and/or embellished information not provided to him by Victim Avery.

33. Det. Miller subsequently obtained a search warrant for Plaintiffs 2011 Rolls Royce on January 9, 2016. The search warrants were obtained based on false, misleading, and/or embellished information in the warrant affidavits by Det. Miller and Victim Avery.

34. Detective Miller than received two additional search warrants for property found in the vehicles - a cell phone and a Dell laptop computer, on February 12, 2016 and February 15, 2016, respectively. These search warrants also were based on false, misleading, and/or embellished information not provided to him by Victim Avery in his statements to Det. Miller.

35.     During trial Det. Miller admits on the stand that the information contained in DD-5s, the felony arrest warrant, and subsequent search warrant affidavits, all written and signed by him, contained embellished, false and misleading information, for which Det. Miller knew was false.

36.     Det. Miller also failed to investigate the inconsistencies in Victim Jackson's statement, which he knew or should of know was false and contradictory testimony.

37.     Further, Det. Miller, admits to only interviewing Victim Jackson once at the scene of the crime, but Victim Jackson's Grand Jury testimony mirrored the false information placed in Det. Miller's later report, the felony arrest warrant, and subsequent search warrant affidavits. Thus, Det. Miller lied about having subsequent contact with Victim Jackson, or Victim Jackson was coached by Prosecuting Attorneys to give false testimony to the Grand Jury under direct testimony.

38.   Plaintiff was indicted by a Grand Jury on January 22,2016, and arrested on January 27,2016.

**Victim Jackson Was Coached By Defendants To Give False Testimony To The Grand Jury Under Direct Testimony**

39.     On January 6, 2016, Plaintiff Mr. Rich was present at the Highline Ballroom as a guest for a holiday employee party.

40.     At some point during the evening Plaintiff was asked to leave the club based on false statements from Victim Jackson that Plaintiff was involved a verbal altercation with the club manager. In fact. Plaintiff went to the restroom and as he returned, the female friend who he accompanied to the party, Wasief Quahtan, was involved in a verbal altercation with the owner. Quahtan was involved in a romantic relationship with the owner, and the owner was angry that she brought Plaintiff to the party. It was this conflict between Quahtan, and the manager's anger, that resulted in Victim Jackson and club security asking Plaintiff to leave the club.

41.     Victim Jackson falsely tells police that Plaintiff is angry, screaming, and threatened that he had a gun, and that shots could be thrown his way.

42.     Victim Jackson falsely tells police that Plaintiff became combative and had to be physical removed from the club by security and as security escorted Plaintiff out of the club. Plaintiff further threatened him as to shots being thrown his way.

43.      Shortly after Plaintiff was escorted from the club a shooting occurs outside the club.

44.     Numerous New York City police officers as well as Det. Miller of the 10th Precinct were dispatched to the scene.

45.      Two NYPD Officers take Victim Jackson's initial statement and Det. Miller takes a second statement from Victim Jackson, which do not match his first account of events leading up to the shooting.

46.       Victim Jackson falsely tells police that at about 2:00 a.m. when he was standing outside the club, he saw Plaintiff get out of his white Rolls Royce, open the truck, pull out a gun, and fire shots. Later accounts in Det. Millers reports say fire shots toward the club, and then fired shots toward Jackson.

47.       Victim Jackson's initial accounts of the events told to Det. Miller are not corroborated by other witnesses, and video surveillance tapes that are not turned over to Plaintiffs Defense Attorneys by the prosecuting District Attorneys - Nasar and Kalra— until five days into Plaintiffs second-degree attempted murder trial.

48.      Prosecuting Attorney David Nasar and Assistant District Attorney Shipla Kalra initially turned over some video to the Defense on or about March 26, 2016, but the video is only one (1) camera angle of 14 camera angles. The additional 13 video footage/angles were not turned over to the Defense until June 9, 2017 - seven (7) days after Plaintiffs criminal trial began - eighteen (18) months after they were collected from the Highline Ballroom management.

49.     During trial, Victim Jackson testified that Plaintiff got into his white Rolls Royce, drove it down the block, then got out of the vehicle, opened the truck, and started firing shots toward him.

50.     The additional interior surveillance video turned over to Defense on June 9,2017, completely contradicts Victim Jackson's statement of events that led up to the shooting outside the club. Specifically, the video shows that Plaintiff was never involved in a verbal altercation with the club manager, nor did he have to be forcibly removed from the premises. The video further show that Victim Jackson is the belligerent aggressor not Plaintiff.

51.     The Defendants, Prosecuting Attorney David Nasar and Assistant District Attorney Shipla Kalra specifically coached the Victim Jackson to fabricates testimonies against the Plaintiff.

52.     Plaintiff had always maintained that he was not argumentative toward anyone, yet he was violently and forcibly escorted out of the club. Plaintiff always maintained that he left the club, got into his Rolls Royce and drove off. Further, Plaintiff was unaware of anything happening outside the club until he noticed someone chasing behind him.

53.     Victim Jackson never told Det. Miller that when Plaintiff drove off in his Rolls Royce that he ran down the street, jumped into a black sedan and began chasing the Plaintiff.

54.     Det. Miller never questions Victim Jackson about the 911 caller statement, who reported after hearing shots she witnessed from her apartment widow a black sedan speeding away.

55.     Further, Prosecutors tried to discount the 911 callers account of events to Defense Attorneys stated that she was not willing to talk and the black sedan she mentioned was a detective car, when in fact, no detectives were on scene until after her 911 call.

56.     At trial, it is later revealed by the Prosecuting Attorney, who are under pressure after the Court discovers Victim Jackson's false statements, that Victim Jackson owned a black sedan that was parked outside the club the night of the shooting.

57.     Further, Victim Jackson testifies at trial that he ran down the street, jumped into the black sedan in chase of Plaintiff in the white Rolls Royce.

58.     The second surveillance video obtained by Det. Miller during the shooting investigation of the exterior of the club, also does not support Victim Jackson's account that Plaintiff was in his Rolls Royce when he exited the club, that Plaintiff got out of the vehicle, opened the truck, pulled out a gun, and fired at him. The video clearly shows Plaintiff driving off and the black sedan chasing the Plaintiffs Rolls Royce. Det. Miller never investigates what is seen on the video.

59.     Det. Miller fails to investigate all the discrepancies in Victim Jackson's statements based on other witness statements, and what is seen on both the interior and exterior surveillance videos and takes Victim Jackson's statements at face value.

60.     Further, at trial it is revealed that NYPD and/or Prosecutors Nasar and ADA Kalra were in possession of the additional surveillance video nearly eighteen (18) months prior to the start of Plaintiffs trial but did not turn it over to Defense until June 5, 2017, in the middle of trial.

61.     After Prosecutors turn over the additional surveillance video to Defense, on June 9, 2017, the Judge questions Victim Jackson outside the Jury.

62.     Victim Jackson pleads Amendment not to incriminated himself, and the Judge appoints him counsel.

63.     To compound the revelation that Prosecutors withheld relevant and exculpatory video surveillance until a week into Plaintiffs trial, and the false testimony Victim Jackson gave during trial and to the Grand Jury, Det. Miller admits in testimony that he embellished or misrepresented statements and facts on subsequent DD-5s (Unusual Occurrence Reports), that were used to obtain a felony arrest warrant for Plaintiff and used in sworn affidavits by Det. Miller to obtain search warrants on Plaintiffs vehicle, cell phone, and laptop computer.

64.     Det. Miller also testifies that he only interviewed Victim Jackson once after the shooting, but Victim Jackson's trial testimony and Grand Jury testimony, matches almost exactly Det. Miller's embellished and misleading information provided on these later DD-5s and search warrant affidavits.

65.     Det. Miller further testifies and admits under cross examination that the DNA evidence found at the scene of the shooting (found on shell casings) did not match Plaintiff.

66.     When the DNA did not match Plaintiff, NYPD reopened the shooting case, but Prosecutors continued to prosecute Plaintiff, despite the lack of physical evidence to tie him to any part of the shooting.

67.     Det. Miller further testifies that five shell casings and one bullet fragment recovered at the scene of the shooting were found in front of the venue. In fact, Det. Miller omits from his testimony that the bullet casings and fragments were not recovered from in front of the venue, but down the street from the club near 8th and 9th Street.

68.     Det. Miller admits in testimony that the bullet casings were actually recovered from the area down the street from the club, which turns out to be where the black sedan was parked, and where Victim Jackson ran to, jumped into the black sedan, and started chasing Plaintiff's white Rolls Royce.

69.     Further, evidence shows NYPD investigators did not find bullet holes anywhere near the front of the club where Victim Avery reported the shooting occurred.

70.     Det. Miller further testifies the only other person he interviewed at the shooting was Wasief Quahtan, who had invited him to the employee party at the club.

71.     The night of the shooting, after Witness Quahtan identified Plaintiff by name, Det. Miller located a DMV photo of Plaintiff and showed it to Quahtan to confirm his identify, identifies Plaintiff's vehicles from the DMV, and pursues him as the only suspect in the case.

72.     Quahtan never told Det. Miller that Plaintiff put a gun in the trunk of his vehicle before they entered the club the evening of the shooting.

73.     Witness Quahtan states she only told Det. Miller that she came to the party with Plaintiff and did not see the shooting, nor did she ever tell Det. Miller that she saw Plaintiff in possession of a firearm before they entered the party the night of the shooting.

74.     Det. Miller again admits during trial testimony that Quahtan never told him that she saw Plaintiff in possession of a weapon the night of the shooting.

75.     Despite contradictory video evidence, despite Victim Jackson's suspect account of the events surround the shooting, despite the contradictor accounts of the 911 caller, despite the DNA evidence recovered at the shooting did not match Plaintiff, despite no weapon was ever recovered from Plaintiff after the execution of search warrants, Det. Miller focused on Plaintiff as the only suspect, and the District Attorney's Office pursued Plaintiff, arrested Plaintiff, and incarcerated Plaintiff.

76.     Not only was a gun never recovered, but no gun shot residue, or any evidence of a gun was found in and around Plaintiffs Rolls Royce, including the trunk of the car.

77.     Further, in pursing Plaintiff as the only suspect in the shooting, on January 10, 2016, Det. Miller showed Victim Jackson a photoshop photo array of six men, which included Plaintiffs mugshot - for which Plaintiffs mugshot had a lighter background than then other photographs. Victim Avery picked Plaintiffs mugshot out of the photo array.

78.     On or about January 27, 2016, Plaintiff was arrested in New Jersey by Detective Miller after being located by the felony apprehension team.

79.     A few days later, in a lineup at the 10th Precinct where Plaintiff is the only bald man in the lineup, police had all the fillers put on blue hats, which did not mask the fact that they were not bald. Further, Plaintiff was the only dark-skinned black man in the lineup.

80.     Defendants Miller, Passementi, Corrando, and other defendants unknown by name to Plaintiff, wilfully, maliciously and intentionally fabricated statements of witnesses, ignored

12

evidence, or the lack thereof, against Plaintiff, and used that fabricated to pursue a wrongful conviction against Plaintiff.

## Mistrial and Dismissal of Case

81.    Based on Victim Jackson's perjured testimony which was coached by the Defendants, and Det. Miller's embellished and false information provided on police reports, DD-5s, and search warrant affidavits as well as the new video surveillance Prosecuting Attorney's disclosed after trial began, the judge in this case declared a mistrial.

82.    After the mistrial. Prosecutor Nasar, who was visibly angry, threatened Plaintiff that he was going to "get you," referring to Plaintiff.

## Plaintiff's Incarceration and Damages

83.    After Plaintiff was arrested on January 27, 2016, he spent approximately three (3) weeks in jail before he was able to raise $50,000.00 to bond out on the $500,000.00 bail set.

84.    Prior to trial. Plaintiff's bond was revoked on or about November 2016 for allegedly tampering with a witness after Victim Avery provide a false statement to the District Attorney that Plaintiff tried to call Avery.

85.    Plaintiff was remanded into custody at the MDC Manhattan Detention Complex in November 2016 and spent approximately eight-and-a-half (8-1/2) months in jail until the case was dismissed in October 2017.

## Plaintiff's Property Damage

86.    As a result of Det. Miller's investigation into Plaintiff has the only suspect in the shooting, Det. Miller obtained a search warrant for Plaintiff's 2011 Roll Royce on January 9, 2016.

87.     Plaintiff's 2011 Rolls Royce was impounded by police on January 11, 2016. When the vehicle was impounded NYPD officers were offered the key fob for the Rolls Royce to gain access to it. The declined to take the key fob when NYPD personnel searched Plaintiffs Rolls Royce for evidence, they used the Jaws of Life or some other type of forceable entry tools to gain access to the trunk of the vehicle causing extensive damage.

88.     NYPD kept Plaintiff 2011 Rolls Royce impounded for more than four (4) months and stored the vehicle in an outside storage facility with the truck open. Due to this wilful negligence, the vehicle sustained severe water and rust damage.

89.     Damage to Plaintiff's vehicle was in excess of $ 10,000.00.

**Plaintiff's Attorney Fees and Costs, and Other Damages**

90.     As a direct and proximate result of Plaintiff's false imprisonment, and malicious prosecution, Plaintiff incurred attorney fees costs, bail costs, and property damage.

91.     Plaintiff has paid in excess of $216,000.00 in attorney fees and cost.

92.     Plaintiff was arrested on January 27, 2016 and spent approximately three (3) weeks in jail until he was bonded out on a $30,000.00 cash bond.

93.     Plaintiff has suffered property/vehicle was damaged in excess of $10,000.00.

94.     As a direct and proximate result of the wrongful arrest, charges, malicious prosecution, and wrongful imprisonment. Plaintiff has suffered emotional distress and mental anguish, physical injuries, pain and suffering.

95.     As a direct and proximate result of the wrongful arrest, charges, malicious prosecution, and wrongful imprisonment. Plaintiff has suffered embarrassment, humiliation, shame, indignity, degradation, loss of quality of life, loss of employment opportunities, and related income.

**COUNT 1**

**42 U.S.C. § 1983 – Malicious Prosecution**

**(Against ALL Defendants)**

96.      Plaintiff hereby realleges and incorporates by reference all previous paragraphs 1 through 95 in this complaint.

97.      Defendants wrongfully initiated or continued a criminal proceeding against Plaintiff.

98.      Defendants, acted with malice when they specifically coached the Victim Jackson to fabricates testimonies against the Plaintiff.

99.      Defendants, and all of them, in bad faith, knew or should have known there was no probable cause to believe Plaintiff was accused of what he was arrested and incarcerated for.

100.    Defendants, and all of them, acted in bad faith by failing to properly investigate witness statements, contradictions in the Victim's statement, concealed evidence, and ignored evidence, and then provided false and misleading information to a Grand Jury; and provided false and misleading information in sworn search warrant affidavits, they knew or should have known was not true.

101.      Based on Victim Jackson's perjured testimony which was coached by the Defendants, and the false information provided on police reports, DD-5s, and search warrant affidavits as well as the new video surveillance Prosecuting Attorney's disclosed after trial began, the judge in this case declared a mistrial.

102.      The proceeding terminated favorably to Plaintiff and after the mistrial Prosecutor Nasar, who was visibly angry, threatened Plaintiff that he was going to "get you," referring to Plaintiff.

103.    These unlawful actions were done with the specific intent to deprive Plaintiff of his constitution rights.

104.    As a direct and proximate consequence of Defendants' actions, and all of them. Plaintiff suffered damages, including but not limited embarrassment, humiliation, shame, indignity, degradation, loss of quality of life, loss of employment opportunities, and related income.

## COUNT 2
## Denial of Fair Trial 42 U.S.C. § 1983
## (Against all Defendants)

105.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs 1 through 95 in this complaint.

106.    Defendants wrongfully initiated or continued a criminal proceeding against Plaintiff.

107.    Defendants owned Plaintiff a duty under the due process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, §§ 2, 5, 6, 8 of the New York Constitution.

108.    Despite this well-defined duty. Plaintiff was deprived of his rights to life and liberty, the right to a fair trial, all of which were stripped from him when he was arrested and falsely accused of the above crimes, he was incarcerated based on false statements, misinformation, and concealed facts and evidence presented as direct evidence at a Grand Jury; incarcerated based on false information on sworn search warrant affidavits; and incarcerated without fully investigating all witnesses, and ignoring evidence of Plaintiff s innocence.

109.    Defendants, collectively, acted in bad faith by failing to properly investigate witness statements, contradictions in the Victim's statement, concealed evidence, and ignored evidence, and then providing false and misleading information to the Grand Jury, as well as providing false and misleading information in sworn search warrant affidavits, which they knew or should have known was false.

110.  The proceeding ended in Plaintiff's favour, and following the mistrial, Prosecutor Nasar, who was visibly enraged, threatened Plaintiff that he would "get you," referring to Plaintiff.

111.  These unlawful actions were done with the specific intent to deprive Plaintiff of his constitution rights.

112.   These unlawful actions were so egregious, so outrageous, that it may fairly shock the contemporary conscience.

113.   As a direct and proximate consequence of the acts of Defendants, Plaintiff has suffered, and continues to suffer injury and damages, including but not limited embarrassment, humiliation, shame, indignity, degradation, loss of quality of life, loss of employment opportunities, and related income.


## COUNT 3

**Joint Action/Conspiracy To Violate Civil Rights 42 U.S.C.  § 1983, Fabrication Of Report/Evidence**
### (Against ALL Defendants)

114.      Plaintiff hereby realleges and incorporates by reference all previous paragraphs 1 through 94 in this complaint.

115.      Defendants, were jointly and severally responsible as Prosecutors assigned to represent the victim to share material information with each other, and to ensure that any reports were not fabricated.

116.      Defendants were acting under color of state law, acted in concert, conspired and agreed to deprive Plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States, in particular the right not to have false reports or evidence used to justify misconduct outlined above. The use of false reports, as well as other actions related to civil rights violations, constitutes an overt act in furtherance of said conspiracy.

117.     Alternatively, as joint actors with joint obligations, each of them was and is responsible for the failures and omissions of each other.

118.     As a result of Defendants', and each of their, violations of Plaintiff's constitutional rights to not be racially profiled, stopped, searched and to not have a false report used against him to justify officer's misconduct, Plaintiff was damaged as alleged above.

119.     In acting as alleged herein, Defendants, and each of them, caused Plaintiff severe emotional injuries, and caused Plaintiff other damages.

120.     Due to the conduct of Defendants, and each of them, Plaintiff had incurred therapy fees, and will continue to incur therapy fees.

121.     The individual Defendants named herein acted with a conscious disregard Plaintiff's rights, conferred upon him by Section 1983, Title 42 of the United States Code, the Fourth and Fourteenth Amendments to the United States Constitution.

122.     Defendants had knowledge of the conspiracy to violate plaintiff's civil rights and of the violations committed, and had power to prevent these wrongs, but neglected or refused to do so in violation of 42 USC §1986.

123.     Defendants' acts were done in knowing violation of plaintiff's legal and constitutional rights, and have directly and proximately caused plaintiff humiliation, mental pain and suffering.

## COUNT 4
### (Declaratory Relief)
### (Against ALL Defendants)

124.     Plaintiff hereby realleges and incorporates by reference all previous paragraphs 1 through 95 in this complaint.

125.     The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the

rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

126.    As described above, this Court has jurisdiction over this matter, and therefore may declare the rights of Plaintiff.

127.    Plaintiff therefore seeks an order declaring Defendants' practices unlawful, and that Defendants' are liable to Plaintiff for damages caused by that practices.

## REQUEST FOR RELIEF

Plaintiff, request judgments against Defendants as follows:

A. Declaring Defendants' actions to be unlawful; permanently enjoining Defendants; 'performing further unfair and unlawful acts as alleged herein;

B. For all recoverable compensatory, statutory, and other damages sustained by Plaintiff, including disgorgement, unjust enrichment, and all other relief allowed under applicable law;

C. Granting Plaintiff awards of restitution and/or disgorgement of Defendants' profits from its unfair and unlawful practices described above;

D. For costs;

E. For both pre-judgment and post-judgment interest on an amount to be decided at trial;

F. For appropriate injunctive relief, including public injunctive relief,

G. For treble damages insofar as they are allowed by applicable laws;

H. For appropriate individual relief as requested above;

I. For payment of attorneys' fees and expert fees as may be allowable under applicable law;

J. For such other and further relief, including declaratory relief, as the Court may deem proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

## <u>RESERVATION OF RIGHTS</u>

Plaintiff reserves its right to further amend this Complaint, upon completion of its investigation and discovery, to assert any additional claims for relief against Defendants or other parties as may be warranted under the circumstances and as allowed by law.

**Dated; May___4th_____ 2022.**

Respectively Submitted by;

BENJAMIN SAMUEL RICH

Plaintiff Pro Se